NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2019 VT 10

No. 2018-289

| | |
|---|---|
| In re N.L., Juvenile | Supreme Court |
| | On Appeal from<br>Superior Court, Chittenden Unit,<br>Family Division |
| | January Term, 2019 |

Nancy J. Waples, J.

Sarah R. Star, Middlebury, for Appellant Mother.

Adele V. Pastor, Barnard, for Appellant Juvenile.

Allison N. Fulcher of Martin & Delaney, Barre, for Appellee Father.

Thomas J. Donovan, Jr., Attorney General, Montpelier, and Jody A. Racht and Martha E. Csala, Assistant Attorneys General, Waterbury, for Appellee State.


PRESENT: Reiber, C.J., Skoglund, Robinson, Eaton and Carroll, JJ.


¶ 1. **SKOGLUND, J.** This case concerns petitions to terminate the parental rights of both mother and father with respect to their child, N.L. The family division of the superior court granted the petition to terminate mother's parental rights but denied the petition concerning father. Mother appeals the termination of her parental rights, and N.L. appeals the court's decision not to terminate father's parental rights. We affirm the termination of mother's parental rights and reverse the court's order declining to terminate father's parental rights. We remand the matter for the limited purpose of directing the family division to grant the petition to terminate father's parental rights.

## I. Facts

¶ 2.    N.L. was born in August 2014.  In January 2016, she was taken into state custody because both parents were using illicit substances, father was facing jail time on a charge alleging domestic abuse against mother, and mother was unable to care for the child due to her drug addiction and homelessness.  N.L. spent several months in foster care.  A conditional custody order (CCO) returned N.L. to mother's care after mother completed a substance-abuse program, and they resided for several months in a residential treatment program at Lund Family Center.  The CCO remained in effect until February 27, 2017, when the Department for Children and Families (DCF) closed the case.

¶ 3.    The present case was initiated based on an incident that occurred in August 2017, at which time DCF was investigating reports of drug use and domestic violence in the home.  Police responded to a report of persons slumped over in a car in a grocery store parking lot, one of whom was mother.  N.L. was in the back seat of the car, which was strewn with drug paraphernalia.  Based on this event, mother was charged with cruelty to a child and pled guilty.  N.L. was placed in DCF custody.  Father, who was not involved in the incident, was living at mother's apartment, in violation of the terms of her voucher program.  Neither parent appeared at the emergency care hearing the day after N.L. was taken into state custody.  At an August 15, 2017 temporary care hearing, the family division ordered visitation between mother and N.L. three times a week, for two hours.  Mother attended the visits regularly until late September 2017, when she stopped going.

¶ 4.    Neither parent appeared for a scheduled October merits hearing.  The hearing was rescheduled for December 19, 2017.  Again, neither parent appeared for the hearing.  The State presented evidence at the hearing, and the family division adjudicated N.L. a child in need of care or supervision (CHINS) after making findings on the record.  Meanwhile, in November 2017, N.L. was placed with the foster family with whom she has remained ever since.

¶ 5.    In January 2018, DCF filed a disposition case plan with a goal of adoption, as well as petitions to terminate both mother's and father's parental rights at initial disposition.  The

2

disposition hearing was held on January 24, 2018, at which time the parents, who both appeared for the hearing, were served with the termination petitions.

¶ 6.     That same month mother completed a residential drug treatment program at Valley Vista and sought resumption of visits with N.L.  But before that could happen, on February 13, 2018, mother was arrested on suspicion of aiding and abetting a bank robbery and brandishing a firearm while in the commission of a felony.  At the time of the termination hearing in May 2018, mother was being held in a federal prison in Virginia.  During this time, father had no contact with N.L.

¶ 7.     The termination hearing was held on May 17, 2017.  In its August 3, 2018 decision, after reviewing the best-interest criteria set forth in 33 V.S.A. § 5114(a), the family division granted the petition to terminate mother's parental rights but denied the petition concerning father. The court continued the CCO then in place with the foster family, changed the case plan goal from solely adoption to concurrent goals of adoption or reunification with father, ordered parent-child contact with father once he completed a required substance-abuse assessment, and adopted a timeframe of three-to-six months for father to achieve the reunification goal.  The court expressly declined to require DCF to prepare a new case plan, finding that its original case plan adequately supported the court's adopted permanency goal.  Mother appeals the termination of her parental rights, and N.L. appeals the family division's decision not to terminate father's parental rights.

## II.  Mother's Appeal

¶ 8.     Mother first argues that, in light of its acknowledgement that she shared a close bond with N.L., the family division erred by terminating her parental rights based on her pretrial incarceration and physical separation from N.L.  Mother points to the court's finding that she had maintained her sobriety since completing the Valley Vista program in January 2018 and asserts that there was no evidence of her unfitness when she was sober.  Mother states that there was no particularized evidence demonstrating that she would not be able to resume visiting N.L. if she were released from incarceration and maintained her sobriety.  According to mother, the court

3

violated her right to due process by basing its determination that she would not be able to resume her parental duties within a reasonable time on speculation that she would be indicted and convicted of the alleged federal offense. She contends that, in assessing N.L.'s best interests, the court failed to weigh the relevant factors concerning her preindictment or pretrial incarceration, including the strength of the criminal case against her and how her alleged conduct impacted her ability to resume her parental duties. In making these arguments, mother cites numerous out-of-state cases, but does not address our recent caselaw on the impact of parental incarceration—and particularly pretrial incarceration—on the family division's best-interests analysis.

¶ 9. The family division "may terminate parental rights at the initial disposition proceeding if the court finds by clear and convincing evidence that termination is in the child's best interests." In re C.P., 2012 VT 100, ¶ 30, 193 Vt. 29, 71 A.3d 1142. "[T]o determine a child's best interests, the court must consider [the] four statutory factors" set forth in § 5114, the most important of which "is the likelihood that the natural parent can resume his or her parental duties within a reasonable period of time" from the perspective of the child's needs. In re D.S., 2014 VT 38, ¶ 22, 196 Vt. 325, 97 A.3d 882. Although this inquiry is forward-looking in the sense that the court must consider the parent's prospective ability to parent the child, "past events are relevant in this analysis." Id. "As long as the court applied the proper standard, we will not disturb its findings unless they are clearly erroneous, and we will affirm its conclusions if they are supported by the findings." Id. (quotation omitted). "We leave it to the sound discretion of the family court to determine the credibility of the witnesses and to weigh the evidence." Id. (quotation omitted).

¶ 10. The fact of a parent's incarceration "is a proper consideration in the court's analysis of [the parent's] fitness pursuant to the statutory standard." Id. ¶ 26. "[O]ur case law makes clear that a parent is responsible for the behavior that leads to incarceration and for the consequences that come with such incarceration." Id. (concluding that father's incarceration during most of child's life was "certainly relevant in assessing his relationship with [the child], his ability to parent [the child], and whether he has played a constructive role in [the child's] life" because it had "a

4

direct impact on his availability as a parental resource to [the child]"); see also In re K.F., 2004 VT 40, ¶ 12, 176 Vt. 636, 852 A.2d 584 (mem.) (affirming termination of father's parental rights where father had not been available as parental resource to child for eleven months, and he continued to be unavailable due to his incarceration).

¶ 11. In In re M.W., we specifically addressed the question of how the family division should consider a parent's pretrial incarceration when examining the best-interest factors. 2016 VT 28, ¶¶ 18-22, 201 Vt. 622, 145 A.3d 1250. In that case, the father sought to distinguish D.S. and K.F. because of the lack of evidence of the father's past criminal convictions and the fact that he had not yet been convicted of the pending charges. We acknowledged that the facts of M.W. could be distinguished from those in D.S. and K.F. based on those points, but nonetheless concluded "that it was appropriate for the family court, irrespective of the fact that the criminal charges against him were still pending, to consider father's incarceration and the consequences of his incarceration in evaluating what course of action was in M.W.'s best interests." Id. We directed "the family court to review the individual circumstances of each child to determine how a parent's incarceration—whether pretrial or not—affects the child's best interests." Id. ¶ 22. We concluded that the court must consider all relevant factors,

> including the nature of the relationship between the parent and child before incarceration, the terms of the incarceration, the needs of the child, and the effect of incarceration on the parent's ability to remain involved with the child and to be in a position to resume parental duties within a reasonable period of time from the perspective of the child.

Id.

¶ 12. Here, the family division found that mother had been N.L.'s primary caregiver for the first three years of N.L.'s life prior to the child's placement in DCF custody, and that during mother's supervised visits, she "was observed to have a strong bond with N.L. and have safe and appropriate parenting skills." In examining the best-interest factors, the court further found that: (1) mother had not seen N.L. since her parent-child contact was suspended in September 2017 due

5

to her failure to consistently attend her court-ordered visitation; (2) N.L. had begun to form a bond with her foster family; (3) mother was "currently incarcerated on serious federal charges which may result in her being imprisoned for a significant length of time"; (4) although mother emphasized her possible release date due to the government's failure to indict her, "she currently is in no position to parent N.L., and . . . she has not been able to parent her for several months"; (5) there was no evidence that mother "attempted to remain engaged with N.L., such as calling her or sending her cards"; and (6) although mother was an important part of N.L.'s life before initiation of the CHINS proceeding, the "precipitating incident leading to N.L. being taken into custody [and mother being charged with cruelty to a child] raises questions as to whether Mother was in fact playing a constructive role in N.L.'s life" and no evidence indicated "that Mother currently plays a constructive role in N.L.'s life."

¶ 13. In considering mother's incarceration, the family division's focus was not on the incarceration per se but rather the impact of her incarceration on her ability to resume parenting within a reasonable time. While mother and N.L. may have demonstrated a bond during the supervised visits that she attended, her failure to consistently attend those visits, which led to their suspension in September 2017, and her drug use undermined any claim that she played a constructive role in N.L.'s life. Shortly after mother's completion of the Valley Vista residential drug treatment program, at a time when she could have potentially renewed visitation with N.L., she was arrested on serious federal charges. During this period, the evidence indicated that mother made no effort to contact N.L. in any way. These findings and conclusions were sufficient to demonstrate by clear and convincing evidence that mother would not be able to resume her parental duties within a reasonable period of time from N.L.'s perspective.

¶ 14. Mother's due process claim is based on a faulty premise—that the court presumed she was guilty of the potential federal charges for which she was incarcerated. The court did not presume her guilt, but rather acknowledged the seriousness of the alleged crimes and the potential

6

for lengthy incarceration, focusing mainly on the impact of her incarceration on her ability to parent N.L. within a reasonable period of time under all the circumstances.

¶ 15.    Mother also argues that the family division erred in terminating her parental rights when the goal remained reunification with the noncustodial father.  According to mother, the court failed to consider what N.L.'s relationship would be with mother if and when father became the custodial parent.  Mother points to the lack of evidence that father would refuse contact with her. She argues that even assuming the pending charges against her rendered her unable to resume her duties as a primary parent within a reasonable period of time, there was no evidence suggesting that she would be unsuitable as a noncustodial parent.  In short, mother asserts that there was no need to extinguish her bond with N.L. at initial disposition, given that N.L. was not freed for adoption and could end up in father's custody.

¶ 16.    This argument loses force here, given our reversal of the family division's order with respect to father.  In any event, it has no merit.  This Court has explicitly rejected the argument that the family division is precluded from terminating one parent's parental rights while leaving the other parent's rights intact.  See In re A.D.T., 174 Vt. 369, 376-77, 817 A.2d 20, 26 (2002) (rejecting mother's argument that because father's parental rights remained intact at time of order terminating her parental rights, "the [family] court should have allowed her to continue to work towards reunification").  "[W]e have repeatedly stated that a valid termination of parental rights does not depend on the availability of permanent foster care or adoption."  In re S.B., 174 Vt. 427, 430, 800 A.2d 476, 480-81 (2002) (mem.) (quotation omitted).  Thus, we have "rejected the claim . . . that the court must consider less drastic alternatives to termination once it has determined the parent to be unfit and unable to resume his or her parental responsibilities."  In re G.F., 2007 VT 11, ¶ 20, 181 Vt. 593, 923 A.2d 578 (mem.).

¶ 17.    Here, the family division duly weighed the statutory criteria and determined by clear and convincing evidence that mother could not resume her parental duties within a reasonable period of time and that whatever bond mother had with N.L. did not overcome other criteria

7

compelling termination of her parental rights. See S.B., 174 Vt. at 428, 800 A.2d at 478 (noting that termination proceeding is "a legislatively created . . . proceeding in which the court is required to weigh specific statutory factors when determining whether to grant a petition for termination of residual parental rights"; see also In re J.F., 2006 VT 45, ¶ 13, 180 Vt. 583, 904 A.2d 1209 (mem.) (recognizing that court may consider strength of parent-child bond in considering appropriate disposition, but noting that bond is not to "be maintained regardless of the cost to the child" (quotation omitted)). We discern no basis in the record to disturb that determination and thus we affirm the termination of mother's parental rights.

### III. N.L.'s Appeal

¶ 18. N.L. joins DCF's brief in support of the family division's order terminating mother's parental rights but argues that the court erred in denying the petition to terminate father's rights. She asserts that the court usurped DCF's statutory duties by changing the disposition goal from adoption to reunification while continuing the plan of services in DCF's case plan that had a singular goal of adoption. She also argues that the record does not support the court's stated bases for declining to terminate father's parental rights. Because we agree with N.L.'s latter argument, we need not address her first argument.[1]

---

[1] As noted, the family division changed the case plan permanency goal from adoption to concurrent goals of adoption or reunification with father and further set forth a specific time frame for father to achieve reunification, without requiring DCF to prepare a new disposition case plan. The court explicitly found, without further explanation, that the case plan adequately supported its new permanency goal. N.L. argues that the court's adoption of a new permanency goal while maintaining the case plan associated with DCF's goal of adoption usurped DCF's statutory obligation to prepare a new reunification plan. Father disputes this argument, but correctly points out that, even if the court erred in this regard, the remedy would not be reversal of the court's denial of the termination petition, but rather a remand for the court to order DCF to create a new case plan. Notably, father has not objected to either the court's adoption of the revised permanency goal nor its finding that the current case adequately supported that goal.

In a recent opinion, where a family division's disposition order added reunification with the father as a concurrent case plan goal in addition to adoption or reunification with the mother, we noted that "the court should have rejected the proposed case plan and ordered DCF to prepare a new one, rather than itself imposing a case-plan goal not reflected in the proposed case plan." In re D.F., 2018 VT 132, ¶ 5 n.1., ___ Vt. ___, ___ A.3d ___. In making that pronouncement, we relied upon 33 V.S.A. § 5318(b), which provides that when the court makes certain disposition

¶ 19.    N.L. contends that the undisputed evidence demonstrates that father, who had never been the child's primary caregiver, basically abandoned her and made no attempt to contact her or even inquire about her well-being from the time she was taken into state custody in August 2017 until the termination petition was filed in January 2018.  Specifically, N.L. challenges three of the court's findings, two that set forth father's contact with DCF between August 2017 and the termination hearing, and one that discusses the bond between N.L. and her foster family.  According to N.L., in those findings the court appears to blame the DCF caseworker rather than father for his conscious choice not to be involved in N.L.'s life after she was taken into custody.  N.L. points to father's testimony that: at the time she was taken into state custody he was living with mother in mother's apartment, in violation of her lease and a no-contact order; he did not contact DCF because of his living situation and his belief that mother would get N.L. back, as she had done before; he was aware of notifications mother received regarding N.L. but made no effort to contact DCF and seek visits with N.L. until the termination petition was filed; and he was responsible for not having contacted DCF or seen N.L. for the previous nine months at the time of the termination hearing.  In N.L.'s view, the court failed to make findings acknowledging the undisputed evidence that father made virtually no effort to become involved in her life.  Hence, N.L. argues, the record does not support the court's determination that her best interests require giving father more time to become part of her life.

¶ 20.    Upon review of the record, we conclude that the family division made inadequate findings on N.L.'s best interests with respect to father—most particularly regarding whether he

orders it "shall establish a permanency goal for the minor child and adopt a case plan prepared by the Department which is designed to achieve the permanency goal."  See also id. § 5316(a), (b)(1), (7) (providing that DCF shall filed disposition case plan that includes "a permanency goal and an estimated date for achieving the permanency goal" and "[a] plan of services . . . required to achieve the permanency goal").  In D.F. we did not disturb the disposition order because the State did not appeal it or challenge the court's imposition of a new case plan goal.  Likewise, here we need not consider if the family division's disposition order violated § 5318(b), given our reversal of the court's order denying termination of father's parental rights in addition to the fact that father did not object to the order.

would be able to resume his parental duties within a reasonable period of time from N.L.'s perspective—and that clear and convincing evidence in the record, as well as the family division's limited findings, compel terminating father's parental rights.

¶ 21. It is undisputed that father, who had never been N.L.'s primary caregiver, was aware that N.L. had been taken into state custody in August 2017 but nevertheless made no effort to contact DCF between that time and January 2018 when the termination petition was filed. While he did appear at a September 2017 pretrial hearing, neither he nor mother appeared at either the scheduled October 2017 merits hearing or the rescheduled December 2017 merits hearing. Although the DCF caseworker testified that she made no extraordinary efforts to discover father's whereabouts, father was sent notifications of hearings through his last known address, and the caseworker unsuccessfully attempted to reach him on his cellphone. Father acknowledged that during this period he was living with mother in violation of the lease and a no-contact order.

¶ 22. Father did contact the DCF case worker shortly before the scheduled January 2018 disposition hearing to request visits with N.L. The caseworker and father set up meetings to discuss contact with N.L., but father canceled those meetings. The caseworker and father finally met in early April 2018, one month prior to the termination hearing at which time father was informed he would have to participate in a substance use assessment and provide a urine sample for urinalysis before visits could begin. Father participated in the assessment and supplied a sample, but because of an unspecified irregularity with the sample, he was required to submit a new sample and was informed of same. He did not do so in a timely manner and thus was required to participate in a new assessment, which he had not done at the time of the termination hearing in May 2018. Consequently, father had not seen or had any contact with N.L. since she was taken into state custody in August 2017.

¶ 23. The family division's limited findings on the lack of contact between N.L. and father are not clearly erroneous. The court found that: (1) father had had no contact with N.L. since she was taken into state custody in August 2017; (2) the DCF caseworker assigned to the

10

case had limited contact information for father; (3) the caseworker did not ask mother for information regarding father's whereabouts; (4) father did not meet the caseworker until the January 2018 disposition hearing; (5) at a March 2018 hearing, the caseworker and father agreed to meet in early April; (6) the caseworker informed father at an April 2018 meeting that he needed to do a substance-abuse assessment before he could begin parent-child contact; (7) he underwent the assessment in mid-April but an irregularity with his sample required him to provide another sample, which he did not do because of transportation issues; (8) he had to do another assessment because of the delay in receiving an acceptable urine sample; and (9) as a result of the delay, father had still had no visits with N.L. at the time of the hearing.

¶ 24.     On the other hand, the court did not discuss or evaluate father's failure to seek contact with N.L., notwithstanding the undisputed evidence that he made no effort to contact DCF or seek contact with N.L. from the time she was taken into state custody in August 2017 until the termination petition was filed in January 2018.  As documented in the January 2018 disposition case plan adopted by the court, at that point N.L. had been in state custody for a significant period of her young life and was in need of permanency due to her attachment issues.  As further noted in the case plan, at this time N.L. had overcome significant behavioral issues and was beginning to bond with her longtime foster family and to become fully engaged in her community.

¶ 25.     The family division stated in its best-interests analysis that father had served as a caretaker for N.L. but had never been her primary caregiver and that his lack of contact with N.L. had been due in part to him not having consistent housing or transportation.  The court concluded that father did not appear to play a constructive role in N.L.'s welfare by providing personal contact and emotional support and affection.  To some extent, the court appeared to excuse father's lack of contact, attributing it in part to complications regarding DCF's requirement that he complete a substance-abuse assessment prior to commencing visits with N.L.  Regarding the critical question as to whether father would be able to resume parental duties within a reasonable period of time, the court recognized that father did not appear to be in a position to parent N.L. but attributed the

paucity of evidence on his parenting ability and the lack of visits between father and N.L. to father's lack of stable housing, transportation, or contact information and "administrative hurdle[s]"[2] in his obtaining a substance-abuse assessment. In the end, the court declined to terminate father's rights at initial disposition and offered him another opportunity to establish regular contact with N.L. to demonstrate that he could resume a parental role in her life.

¶ 26. As noted above, when termination of parental rights is sought at the initial disposition stage, the family division is not being asked to modify a previous disposition order and thus does not initially consider whether there has been a substantial change of circumstances from an earlier order. Rather, the court determines only whether there is clear and convincing evidence that the best interests of the child warrant termination of parental rights. C.P., 2012 VT 100, ¶ 30. In making a disposition order, the family division is guided by the child's best interests, 33 V.S.A. § 5318(a), which do not include an evaluation of DCF's conduct during the case. It is incumbent upon the court to consider the child's best interests based on the statutory criteria set forth in 33 V.S.A. § 5114(a), the most important of which "is whether the parent will be able to resume parenting duties within a reasonable period of time." Id. As we have repeatedly emphasized, "[t]he reasonableness of the time period is measured from the perspective of the child's needs, and may take account of the child's young age or special needs." Id. (citations omitted).

¶ 27. Here, in considering the best-interests criteria, including the most critical criterion of whether father could resume his parental duties within a reasonable period of time from N.L.'s perspective, the family division's brief analysis focused primarily on the reasons for father's lack of contact with N.L., which it attributed primarily to administrative hurdles. Although "the level

---

[2] In using the vague term "administrative hurdle[s]," the family division appears to refer solely to the substance-abuse assessment and urine sample required of father before any visits could start. Notably, that hurdle came about only after the termination petition was filed and after many months during which father failed to seek contact with N.L. despite being aware that she was in state custody. Father himself acknowledged that, given his history, it was entirely reasonable for any visitation to be conditioned upon him participating a substance-abuse assessment.

of assistance provided to parents is relevant to determining whether a parent is unlikely to be able to resume parental duties within a reasonable period of time," we have noted that "[t]he extent of DCF's efforts to achieve the permanency plan is not one of the best-interests factors to be considered at termination." In re D.C., 2012 VT 108, ¶¶ 32-33, 193 Vt. 101, 71 A.3d 1191 (noting that mother was content to play minimal role in child's life and did not consider herself candidate for reunification from beginning of DCF's involvement in case). Significantly, in its best-interests analysis, the court failed to make findings and conclusions assessing whether father would be able to resume parental duties from N.L.'s perspective. Given that he had never been considered a primary caregiver and had not seen this young child in over eighteen months, there was no evidence about any existing relationship between father and N.L.

¶ 28. Other than suggesting that administrative hurdles had played a role in father not seeing N.L. for a significant period of time, the family division did not explain why mother's rights were terminated for failing to remain engaged with N.L. while father's were not—even though mother had been N.L.'s primary caregiver for the first three years of N.L.'s life prior to the child's placement in state custody and mother was observed during supervised visits "to have a strong bond with N.L. and . . . safe and appropriate parenting skills." As noted, the court terminated mother's parental rights because: (1) mother had not seen N.L. since her parent-child contact was suspended in September 2017 due to her failure to consistently attend her court-ordered visitation and her incarceration; (2) there was no evidence that mother "attempted to remain engaged with N.L., such as calling her or sending her cards"; (3) mother's actions indicated that she did not play a constructive role in N.L.'s life; (4) mother had not been able to parent N.L. for several months and was still in no position to do so; and (5) N.L. had begun to form a bond with her foster family, with whom she had lived for a significant period of her young life. Notably, the same was true for

13

father, except, as the court found, there was virtually no evidence that father ever played a constructive role in N.L.'s life or formed a close bond with the child.[3]

¶ 29.    This is one of those rare cases in which we need not remand the matter to the family division to make the appropriate findings because the record, as described above, demonstrates by clear and convincing evidence that the statutory best-interests factors compel termination of father's parental rights.  Cf. J.F., 2006 VT 45, ¶¶ 13, 17 (reversing trial court's decision not to terminate parents' parental rights with respect to some of their children after finding no record support for decision).  The record shows that father has never played a constructive role in N.L.'s life, that he made no effort to establish visits with N.L. for a critical period of several months after she was taken into state custody, that he was responsible for the lengthy delay in establishing any contact, and that he would not be able to resume any parenting role within a reasonable period of time from N.L.'s perspective, considering her age, the length of time she had spent in state custody, and her need for permanency.

¶ 30.    We reject the dissent's suggestion that we are have overstepped our authority by ignoring the applicable standard of review, weighing the evidence, assessing the credibility of witnesses, and engaging in appellate factfinding.  To the contrary, upon careful review of the record before us, we conclude that, in denying the termination petition, the family division abused its broad discretion by exercising that discretion based on untenable grounds.  See In re T.S., 144

---

[3]  There is no support in the record for the dissent's attempt to distinguish mother's and father's situations by suggesting that father, unlike mother, had no opportunity to maintain contact with N.L.  The undisputed evidence was that father was aware from the beginning of N.L.'s placement in state custody but for several critical months took no steps whatsoever to contact DCF or seek to maintain contact with N.L.—whether it was because he assumed mother would regain custody or he thought it might jeopardize his living situation with mother.  He repeatedly acknowledged at the termination hearing that he was responsible for DCF's inability to reach him—and thus for his lack of contact with N.L.  Moreover, father acknowledged at the hearing that that he was in no position to parent N.L. at the time because he was temporarily renting a room from a friend after moving from a motel, he had a suspended driver's license and no car, and he had just started a new job.  He also acknowledged that he had a history of drug abuse and two convictions for driving while intoxicated, the most recent being in 2016, and yet was not currently engaged in any drug treatment program.  In short, the undisputed testimony demonstrates that father had ample opportunity to seek contact with N.L. but elected not to do so.

Vt. 592, 594, 481 A.2d 21, 22 (1984) ("To support a claim of abuse of discretion, a party must show that the court failed to exercise its discretion, or that its discretion was exercised for reasons clearly untenable or to an extent clearly unreasonable."). We need not weigh the evidence or assess the credibility of witnesses in this case, where the undisputed testimony, as discussed above, demonstrated that father made no attempt to play a constructive role in N.L.'s life during a critical period while she was in state custody and that his belated efforts at seeking visitation after the filing of the termination petition were delayed as the result of his actions or inactions. The court did not find, and the record would not support, a finding that father's lack of contact with DCF or efforts to be part of N.L.'s life was the result of any failures on DCF's part. The primary basis for the court's decision not to terminate father's parental rights was the "administrative hurdles" father encountered, not whether father could resume his parental role within a reasonable period of time from N.L.'s perspective. In any event, as noted above, those hurdles, which caused further delay primarily because of father's actions or inactions, became an issue only after the filing of the termination petition and after many months during which father failed to seek contact with N.L. In short, the record, including the family division's findings, does not provide a tenable basis for the court to deny the termination petition as to father.

The family division's order terminating mother's parental rights is affirmed. The family division's order declining to terminate father's parental rights is reversed, and the matter is remanded for the court to grant the petition to terminate father's parental rights.

FOR THE COURT:

_____
Associate Justice

¶ 31. **ROBINSON, J., concurring in part and dissenting in part.** These cases are hard. Termination of parental rights may sever an established parent-child relationship that is both constitutionally protected and potentially vitally important to child and parent alike. But the failure to terminate when the evidence warrants it risks extending a period of uncertainty, with potential

15

adverse impacts on the very children the laws seek to protect. I believe the best way to manage these difficulties is to rely on the system we have established—one in which a factfinder who can directly observe the witnesses and review the evidence in that context determines the facts and exercises the difficult discretionary judgments, and an appellate court ensures that the factual findings are in fact supported by evidence in the written record and the difficult judgment as to the ultimate question falls within the trial court's broad discretion, subject to clear standards on review. I believe the majority, however well intentioned, has departed from this framework by filling in the gaps it perceives in the trial court's factfinding with appellate factfindings of its own. For that reason, I respectfully dissent from the majority's ruling reversing the trial court's denial of the termination petition as to father.[4]

¶ 32. The logic of the majority's decision here requires a two-step analysis: first, that the trial court's findings in connection with its rejection of the State's termination-of-parental-rights (TPR) petition with respect to father were inadequate to support its conclusion because the trial court failed to evaluate father's failure to seek contact with N.L., ante, ¶¶ 20, 24; and second, that the proper remedy is not to remand for the trial court to make appropriate findings but, rather, is to find that the evidence in this case, as a matter of law, compels the conclusion that termination is in N.L.'s best interests, ante, ¶ 29. I have serious qualms about the first step of the analysis, but view the second as a radical overstep of this Court's authority and role, especially given the high burden the State faces in terminating parental rights at initial disposition.

## I. Adequacy of the Trial Court's Findings

¶ 33. With respect to the first step of the majority's analysis—its conclusion that the trial court's findings were inadequate with respect to father's reasons for seeking contact with N.L.—the majority improperly rejects as irrelevant the findings the trial court did make concerning father's lack of contact. In particular, the majority acknowledges that the trial court attributed

---

[4] I join the majority's affirmance of the trial court's judgment of termination as to mother.

father's lack of contact with N.L. "primarily to administrative hurdles," ante ¶ 27, but concludes that the extent of the efforts of the Department for Children and Families (DCF) to provide services is irrelevant to the best-interests analysis. In other words, the trial court's findings as to the reasons for father's lack of contact with N.L. during the pendency of this case were inadequate because the trial court erroneously assigned weight to the administrative hurdles that the trial court concluded contributed to father's lack of contact.

¶ 34. I have serious qualms about this analysis because I believe it amounts to a reweighing of the evidence. The context of the trial court's discussion of the impediments to father's contact with N.L. is important. The court considered the reasons for father's lack of contact with N.L. in the course of its best-interests analysis. I reproduce the court's findings concerning the likelihood of father resuming parental duties for N.L. and whether he plays a constructive role in N.L.'s life in their entirety because the context and full analysis underlying the court's conclusions on these points are highly relevant:

> Father also appears to be in no position currently to assume parental duties for N.L. However, Father has faced administrative hurdles to even having the opportunity to visit with N.L. that have been exacerbated by his lack of stable residence or contact information, and lack of transportation resources. Mother indicated that Father has cared for N.L. as recently as August 2017, though never as her primary caregiver. Both DCF and the Court lack information as to Father's current ability to parent N.L.
>
> . . . .
>
> Father has also not had contact with N.L. in over six months, either physical or via phone or other form of communication, based on the evidence presented to the Court. Thus, it does not appear that he continues to play a constructive role, including personal contact and demonstrated emotional support and affection, in N.L.'s welfare. However, the evidence suggests that Father's lack of contact is due at least in part to DCF's requirement that he pass a substance abuse assessment prior to his having any contact with N.L., and the complications that have arisen that have kept him from overcoming this administrative hurdle. Given the fundamental nature of the rights at stake, the Court is loathe to terminate Father's parental rights at initial disposition without having even offered him the opportunity to establish regular contact with N.L. and demonstrate his present ability to assume parental duties for her and that he can

17

play a constructive role in her life. Though certainly N.L. needs stability and is a young child, she has been in custody as of the date of the hearing less than a year. The court will allow Father three to six months to demonstrate his willingness and ability to assume parental duties in caring for his child.

¶ 35. The trial court's analysis as a whole is well-considered and cognizant of the applicable standards. This is not a case in which a parent is challenging termination on the basis that DCF's services were inadequate. Rather, in considering whether there is a reasonable probability that father could resume parenting duties, the trial court acknowledged that (1) some evidence reflects that father exercised parenting duties relatively recently, (2) it did not have information as to father's current ability to parent N.L., and (3) father had faced administrative hurdles in even having the opportunity to visit with N.L.[5] The trial court's assessment as to whether father would be able to resume parental duties in a reasonable time and as to whether he plays a constructive role in N.L.'s life were both based in part on the fact that the trial court was not persuaded that the lack of contact fully reflected father's parenting abilities or commitment, or the quality of his relationship with N.L. The trial court concluded that a short increment of additional time would give father the opportunity to act, or not, before the court took the drastic step of terminating father's parental rights.

¶ 36. Whether I would have weighed the evidence the same way, or analyzed N.L.'s best interests the same way, is beside the point; I have a hard time concluding that the trial court's line of reasoning exceeds its broad discretion. See In re S.B., 174 Vt. 427, 429, 800 A.2d 476, 479

---

[5] This last conclusion explains the distinction between father and mother that the majority asserts is lacking in the trial court's decision. Mother's lack of contact with N.L. followed a long period in which mother clearly had opportunities to maintain contact but had failed to do so, whereas father's lack of contact was brought about at least in part by a lack of opportunity and thus may not support the same inferences concerning father's ability to parent or commitment to parenting N.L. The majority acknowledges that the "administrative hurdles" distinguish the trial court's best-interests analysis as to mother and father, respectively, but implicitly dismisses this distinction as irrelevant. I do not deny that considerable evidence does call father's parenting ability and commitment to parenting N.L. into question, but the trial court's findings and conclusions as to mother and father, respectively, are not inconsistent as the majority suggests. Ante, ¶ 28.

18

(2002) (mem.) (explaining that our role "is not to second-guess the family court or to reweigh the evidence, but rather to determine whether the court abused its discretion").  Nevertheless, if the majority concluded that the proper remedy for an order not sufficiently supported by the findings was a remand to allow the trial court to make additional findings, I would, with qualms, likely join.  See, e.g., Parker v. Parker, 2012 VT 20, ¶¶ 13, 19, 191 Vt. 222, 45 A.3d 48 (remanding for further findings where trial court's findings and conclusions were "not sufficient for us to understand the basis of its decision and to engage in informed appellate review").  But I cannot join in the majority's extraordinary act of itself evaluating the evidence and making the critical findings that the trial court concluded that it could not make—including that father cannot resume parental duties in a reasonable time—especially given that the facts of this case are not particularly extraordinary.

II.  The Majority's Extraordinary Remedy of Terminating Father's Rights on Appeal

¶ 37.  Because the decision to terminate a parent's rights implicates the constitutional rights of both parent and child, the State must clear a high evidentiary bar to support termination.  By concluding that the evidence in this case compels particular findings as a matter of law, and that the evidence (whether or not actually credited by the trial court and reflected in its findings) compels a particular conclusion as a matter of law, the majority not only tests these principles, but it departs from our assigned role as a court of appellate review.  If this truly were an extraordinary case, I might be tempted to join the majority.  But the facts of this case, as reflected in the trial court's findings, are depressingly common; nothing in this case warrants the highly unusual approach the majority has brought to this case, or provides a principled limitation on the Court's future assertion of such extraordinary authority.

¶ 38.  This Court has recognized that the State's authority to interfere with the parent-child relationship in the name of protecting children is "awesome," and is accordingly subject to rigorous statutory restraints.  In re N.H., 135 Vt. 230, 235-37, 373 A.2d 851, 855-57 (1977).  Moreover, the U.S. Supreme Court has recognized that under the Constitution, a state may not

19

terminate a parent's rights without proving unfitness by clear and convincing evidence. Santosky v. Kramer, 455 U.S. 745, 755-56 (1982). We have held that Vermont's statutory "best-interests" criteria, 33 V.S.A. § 5114(a), embody Vermont's standards for determining parental unfitness. In re D.C., 2012 VT 108, ¶ 22, 193 Vt. 101, 71 A.3d 1191. The requirement that the State prove, and the (trial) court find, that termination is in the child's best interests by clear and convincing evidence satisfies not only a statutory requirement, but also a constitutional imperative.

¶ 39. When the State seeks to terminate a parent's rights at initial disposition, without first implementing a plan to attempt to enable a parent and child to reunify, these concerns may be particularly acute. See In re B.M., 165 Vt. 194, 199, 679 A.2d 891, 895 (1996) (reaffirming that "termination at initial disposition should be rare because it bars all hope of family reunion" (quotation omitted)); see also In re J.T., 166 Vt. 173, 177, 693 A.2d 283, 285 (1997) (termination after prior disposition order and approved case plan is preferred to termination at initial disposition).[6] Because of the substantial and permanent consequences of a termination of parental rights, with profound implications for the constitutional rights and most intimate personal experiences of both parent and child, as a court of appellate review, we must ensure that trial-court decisions terminating parental rights are supported by clear and convincing evidence. Given the constitutional significance of the termination decision, for this Court to conclude that evidence not only permits a trial court to conclude by clear and convincing evidence that termination is in a child's best interests but actually compels such a conclusion requires particularly incontrovertible evidence of parental unfitness from which no reasonable factfinder could reach any conclusion other than that termination is compelled by clear and convincing evidence.

¶ 40. That's because the role of this Court is to correct legal errors. "When findings are attacked on appeal, our role is limited to determining whether they are supported by credible

---

[6] The trial court recognized and relied on these constitutional considerations in concluding that N.L.'s best interests would be served by providing father additional time to comply with an approved case plan.

20

evidence. We leave it to the sound discretion of the family court to determine the credibility of the witnesses and to weigh the evidence." In re A.F., 160 Vt. 175, 178, 624 A.2d 867, 869 (1993) (citation omitted). The trial court has broad discretion in evaluating the best-interests criteria and deciding whether to grant a petition to terminate a parent's parental rights. In re D.M., 2004 VT 41, ¶ 5, 176 Vt. 639, 852 A.2d 588 (mem.). In entering a judgment of termination on appeal, the majority has usurped the role of the trial court in: (1) making findings based on the evidence; and (2) balancing its findings, and the various best-interests factors, to reach the ultimate conclusion as to whether termination is in N.L.'s best interests.

¶ 41. As to the first point, the majority has taken over the trial court's factfinding role, contradicting the trial court's factfinding based on the majority's own read of the evidence, and filling in gaps where the majority found them. The trial court found that father: (1) has served as a caretaker for N.L, though never as the primary caretaker; (2) has not had contact with N.L. since August 2017 (the TPR hearing was in May 2018) due in part to administrative difficulties and transportation challenges; (3) acknowledged difficulties with substance abuse in the past but denied any present issues; (4) acknowledged casual consumption of alcohol at present; (5) is employed; (6) does not have a driver's license; (7) was renting a room in a friend's home at the time of the disposition hearing but believed he could find his own housing within a month or two; and (8) was not present at the time of the incident underlying the CHINS petition. The trial court made no findings about father's pre-CHINS relationship with N.L., nor his parenting strengths or weaknesses. The court made no findings that father's circumstances or capabilities were incompatible with parenting. Instead, it expressly concluded that both DCF and the court lack information as to father's current parenting ability.

¶ 42. In justifying its decision to grant the petition to terminate father's rights on appeal, the majority essentially reviews the record itself and makes its own findings from the evidence, concluding that "[t]he record shows" that (1) father has never played a constructive role in N.L.'s life (a fact about which the trial court made no findings); (2) he made no effort to establish visits

21

with N.L. for a critical period of several months after she was taken into state custody and was responsible for the lengthy delay in establishing any contact (an appellate finding that directly contradicts the trial court's own finding attributing the delay in part to administrative hurdles and transportation challenges); and (3) he would not be able to resume any parenting role within a reasonable period of time from N.L.'s perspective (a matter about which the trial court expressly concluded both DCF and the court lack information). Ante, ¶ 29. These appellate findings reflect a radical departure from our traditional role of leaving it to "the sound discretion of the family court to determine the credibility of the witnesses and to weigh the evidence." A.F., 160 Vt. at 178, 624 A.2d at 869. I might affirm the majority's assessment if it had been rendered by a factfinder who observed the witnesses firsthand, but cannot join it when undertaken in the context of appellate review.[7]

¶ 43. Moreover, the actual weighing of the best-interests factors is a fundamentally discretionary act. Although the court's findings and conclusion must be supported by clear and convincing evidence, the weight the court affords to, for example, the quality of the child's relationship with a parent versus the parent's ability to resume parental duties, is at its core a discretionary decision. It's one thing to conclude that the trial court has exceeded its discretion in balancing the various factors; it's quite another for the majority to assert the discretionary prerogative itself, applying its own discretion to balance the various best-interests factors to reach its own independent determination of the child's best interests.

---

[7] Whether the majority's assessment, had it been rendered by a trial court, is affirmable is actually somewhat questionable. The majority asserts broadly that father would not be able to resume parenting N.L. within a reasonable time, but offers no explanation to support its conclusory claim. Lee v. Ogilbee, 2018 VT 96, ¶¶ 24-25, __ Vt. __, __ A.3d __ (explaining trial court's application of law to findings must be adequate to explain how it arrived at decision; "conclusory" statements are inadequate). Given the absence of any findings that support the conclusion that father never played a constructive role in N.L.'s life—either by the trial court or the majority in its appellate factfinding role—I have doubts as to whether this unsubstantiated assertion would survive appellate review.

¶ 44. This is not the kind of extraordinary case in which the evidence is so incontrovertible and the facts so compelling that they amount to parental unfitness and grounds to terminate parental rights <u>as a matter of law</u>. As a consequence, I fear that the majority's analysis will have far-reaching consequences beyond this particular case.

¶ 45. The majority cites <u>In re J.F.</u>, 2006 VT 45, ¶¶ 13, 17, 180 Vt. 583, 904 A.2d 1209 (mem.), for the proposition that this is "one of those rare cases in which we need not remand the matter to the family division to make the appropriate findings because the record, as described above, demonstrates by clear and convincing evidence that the statutory best-interests factors compel termination of father's parental rights." <u>Ante</u>, ¶ 29. This case is a far cry from <u>J.F.</u> There, the trial court's findings—which no party challenged—reflected a long history of the parents physically abusing and educationally and medically neglecting their children. The parents socially isolated the children. The children were underweight, and one was emaciated. The youngest children's toenails were green and so overgrown they had begun to curl under their feet. The seven- and five-year-old were not toilet-trained. While the children and parents were strongly bonded—and this was why the trial court denied termination—we noted that even this bond was harmful: "the evidence and findings in this case demonstrate that the bond between the parents and the children has fostered clannishness to an extreme and led directly to neglectful deficiencies in the children's health, education, and adaption to society in general." <u>J.F.</u>, 2006 VT 45, ¶ 13. In light of all this, we held "the evidence, as well as the court's findings and conclusions, overwhelmingly support the termination petition." <u>Id</u>.

¶ 46. Here, the majority relies upon father's failure to contact N.L. during the pendency of the case, and its view—contrary to that of the trial court—that this failure rests squarely and solely on father's shoulders to support its termination order. Neither the trial court nor the majority purports to make any findings about abuse or neglect suffered by N.L. while in father's care, nor obstacles to father's safe and responsible parenting. It's hard to see what about these facts, or the evidence in this record, make this case so rare or extraordinary relative to the shocking cases of

23

abuse and neglect that cross our docket every day. If this record compels any particular outcome as a matter of law (termination or nontermination), it's hard to see how the vast majority of the abuse and neglect cases we see don't likewise qualify for essentially nondeferential factual review by this Court. The majority has not explained why this case in particular warrants such extraordinary treatment, and has not provided any limiting principle to ensure that we don't take the same approach in virtually any discretionary decision with which the members of this Court seriously disagree. Any downside to prolonging this case by following the ordinary course of appellate review and remanding to the trial court to find facts and exercise discretion concerning N.L.'s best interests is far outweighed in my view by the perils of eroding the distinction between the role of a factfinder and our role as a court of appellate review.

¶ 47. The majority's approach is particularly perplexing given the transient nature of an order declining to terminate parental rights. Neither an outright affirmance nor a remand for further findings would doom N.L. to a prolonged purgatory awaiting permanency. If this Court remanded for further findings, the trial court could augment its findings relatively quickly. In doing so, it would either provide more support for its decision <u>not</u> to terminate father's rights—thereby giving this Court additional findings to review—or it would conclude based upon further analysis and more in-depth review that termination was in fact appropriate. This would not push permanency months down the track.

¶ 48. Meanwhile, whether we affirmed or remanded, the State would still be free to seek termination of father's parental rights if he was not, as expected by the trial court, ready to resume parental duties within six months of the court's order. That's because, unlike an order actually terminating parental rights, an order declining to terminate parental rights does not preclude the State or a party from renewing the motion; it may prolong the period of uncertainty for a child pending a final disposition, but it does not irrevocably terminate a parent-child relationship. The case plan approved by the trial court called for reunification within three to six months. That means proceedings in the trial court are ongoing. If father is not ready to resume parental duties

24

by now, and immediate reunification with father is not in N.L.'s interests, a trial court can terminate father's parental rights—accomplishing the same outcome as the majority's decision in this case, but through the legal framework intended to apply to termination decisions. On the other hand, if a trial court concludes that reunification is, in fact, in N.L.'s best interests at this time, then it will be clear that a preemptive decision by this Court to terminate father's parental rights would have undermined significant statutory and constitutional imperatives. For these reasons, I respectfully dissent.

_____
Associate Justice