VERMONT SUPREME COURT
109 State Street
Montpelier VT 05609-0801
802-828-4774
www.vermontjudiciary.org



Case No.     24-AP-321

*Note: In the case title, an asterisk (\*) indicates an appellant and a double asterisk (\*\*) indicates a cross-appellant. Decisions of a three-justice panel are not to be considered as precedent before any tribunal.*

## ENTRY ORDER

MARCH TERM,   2025

| | |
|---|---|
| In re O.S., Juvenile | } APPEALED FROM: |
| (C.S., Father*) | } |
| | } Superior Court, Bennington Unit, |
| | } Family Division |
| | } CASE NO. 22-JV-00879 |
| | Trial Judge: Howard A. Kalfus |

In the above-entitled cause, the Clerk will enter:

Father appeals the termination of his parental rights in son O.S. We affirm.

O.S. was born in January 2019. Father became his sole custodian after mother's death in February 2020. In April 2020 and May 2021, the State filed petitions alleging that O.S. was a child in need of care or supervision (CHINS). As discussed below, both juvenile proceedings had been closed—and unconditional custody of O.S. returned to father—when the instant case commenced with the filing of a third CHINS petition in June 2022. At that time, the court granted the State's request to transfer custody of O.S. back to the Department for Children and Families (DCF).

The court held a contested hearing on the merits of the State's third petition in August 2022. It made the following findings by a preponderance of the evidence.

The State filed its first petition in April 2020 after father was arrested for allegedly assaulting his partner. O.S. was placed in DCF custody. In August of that year, father stipulated to the merits of the State's petition. At the time, DCF's concerns centered on father's issues with substance abuse and anger management and the cleanliness of his home. Father engaged in counseling, and the court returned O.S. to his care under a conditional custody order (CCO) in January 2021.

In May 2021, the State filed a second petition alleging that O.S. was CHINS and sought his return to DCF custody based on an allegation that father's recent use of substances had placed O.S. at risk of harm. The court vacated the CCO in the first proceeding and transferred custody of O.S. back to DCF.

In June 2021, the court issued a permanency order in the first CHINS proceeding. The order continued DCF custody but established a goal of reunification with father by September of

that year. Two days later, the State dismissed the second juvenile proceeding. The court returned O.S. to father's custody under a CCO in September 2021. In February 2022, it vacated the CCO, returned unconditional custody to father, and closed the case.

Between February 2022 and the filing of the State's third petition in June 2022, police were called to father's home three times. On each occasion, O.S. was in father's care and the police made observations of father's behavior and presentation that led them to suspect he was under the influence of a drug. In one instance, father and his partner acknowledged that they had a verbal argument the night before which resulted in the partner leaving the home, wrapping herself in a tarp, and sleeping outside in the rain and cold rather than returning to the residence. During two of these visits, the police found the home in poor condition.

At the time of the most recent incident in June, the home contained a great deal of garbage, had dirty dishes and flies, and was very difficult to walk through. On that occasion, father's partner reported to the police that father had placed his hand around her neck. Though she later modified this statement, a police officer noticed redness around her throat. The partner also indicated that she and father had used crack cocaine that morning, and the officer observed that they both appeared agitated and frantic. Father denied assaulting his partner but admitted to using crack cocaine, although he stated that he had done so a few days earlier and outside O.S.'s presence. He was cited with a violation of his criminal conditions of release as a result of this admission.

The court found that between O.S.'s return to father's unconditional custody in February 2022 and the filing of the State's third petition in June, three-year-old O.S. was exposed to ongoing domestic violence in the home, and father and his partner were using cocaine and had been under the influence while caring for O.S. When considered in connection with the condition of the home and the recency of O.S.'s return to father's custody, the cumulative impact of these circumstances established that O.S. was at risk of harm. The court therefore concluded that the State had demonstrated that O.S. was CHINS.

A disposition hearing was held in December 2022. DCF filed a case plan with a goal of reunification with father by April 2023. The proposed action steps for father centered on successfully working with service providers to address historical concerns related to substance abuse and domestic violence and the related risks they posed to O.S.'s safety in the home. Father agreed to the case-plan goal, which was adopted by the court in a disposition order.

In April 2023, DCF filed a case update seeking to continue O.S. in its custody and extend the goal date for reunification with father until November 2023. It prepared a permanency case plan consistent with this goal. Father's action steps included engaging in mental-health and substance-abuse evaluations and following treatment recommendations, communicating with DCF and signing releases allowing the agency to obtain information from service providers, not accruing additional criminal charges, maintaining a safe home free of violence or illicit substances, and completing the Nurturing Parents and Caring Dads programs. The court adopted DCF's case plan in June 2023. It cautioned that while it appeared from DCF's report that there was a strong bond between father and O.S., the report also suggested that father had thus far made little progress toward addressing the concerns that led to O.S.'s removal from his care.

In November 2023, the State filed a petition seeking termination of father's parental rights. A hearing on the petition was scheduled for April 2024. At a pretrial conference in March, the State indicated that father had recently made a "positive start at progress on his plan" and requested that the termination hearing be continued to afford him an opportunity to

demonstrate that he could maintain these efforts over time. Accordingly, the court rescheduled the hearing for August 2, 2024.

Father did not appear at the August 2 hearing. Father's attorney indicated that he had just learned father was in a residential-treatment program. The hearing was reset for later the same month. Father appeared at the rescheduled hearing on August 27. The court heard testimony from O.S.'s maternal grandmother—who was also his foster mother—and the DCF worker assigned to his case. At the conclusion of the hearing, the court made the following findings by clear and convincing evidence.

O.S. was five-and-a-half years old at the time of the hearing, had some special needs, and was preparing to enter kindergarten. He been the subject of three CHINS petitions and spent more than three years in DCF custody. O.S. had experienced harm each time he was in father's care and, given his young age, needed permanency.

Father undoubtedly loved O.S., and there was a strong bond between the two. At times, father had made remarkable progress in addressing DCF's concerns. But father also seemed to "take a couple steps forward and a couple of steps back." During all three cases, father was absent from O.S.'s life for short periods, whether because he was incarcerated or because he otherwise stopped attending visits. In the instant case, the court had continued the termination hearing scheduled for April 2023 at DCF's request because father was again making progress. However, as it had before, father's progress faltered several months later.

Overall, father's attendance at visits with O.S. was poor. He attended approximately half of the offered visits. He also sometimes arrived late, which was difficult for O.S. Though father had the skills to safely and appropriately parent O.S. when he was present, the court lacked confidence that father could maintain this progress and provide O.S. with the consistency he needed over time.

Each time O.S. was removed from father's custody, he was placed with his maternal grandmother. As a result, she had been meeting O.S.'s needs for more than 60% of his life. Although there was conflict between father and O.S.'s maternal extended family, grandmother ensured that father was not excluded from O.S.'s life. She was committed to supporting continued contact between father and O.S. so long as that contact was safe and appropriate for O.S.

The court found that there had been a change in circumstances since initial disposition due to father's stagnation. It weighed the statutory best-interest factors and determined, among other things, that O.S. needed permanency and that father was unlikely to be able to resume his parental duties within a reasonable time as measured from O.S.'s perspective. It therefore granted the State's petition to terminate father's parental rights.

On appeal, father argues that the family court erred in finding changed circumstances. In the alternative, he challenges its assessment of two of the four statutory best-interest factors.

Where the State moves to terminate parental rights after initial disposition, the court must first determine whether "a change in circumstances requires such action to serve the best interests of the child." 33 V.S.A. § 5113(b). Changed circumstances are "most often found when a parent's ability to care for a child has either stagnated or deteriorated over the passage of time." In re S.W., 2003 VT 90, ¶ 4, 176 Vt. 517 (mem.) (quotation omitted). If this threshold condition is met, the court must consider whether termination is in the child's best interests under

the four factors set forth at 33 V.S.A. § 5114(a). Provided the trial court applied the proper standard, we will not disturb its findings unless clearly erroneous, and we will affirm its conclusions if supported by those findings. In re N.L., 2019 VT 10, ¶ 9, 209 Vt. 450.

We first consider father's argument that the evidence did not support the court's finding of changed circumstances. He points to his completion of the Nurturing Parenting, Caring Dads, and Strengthening Families programs and notes that he had recently attended inpatient substance-use treatment, asserting that, at the time of the final hearing, he was engaged with a recovery network. Father also observes that DCF had, at various times, reported positively about his engagement with O.S. during visits.

While "[s]tagnation may be found if the parent has not made the progress expected in the plan of services for the family despite the passage of time," the case plan is not "a mere checklist the parent must satisfy to ensure the automatic return of the child[] to the parent's care." In re D.M., 2004 VT 41, ¶¶ 5, 7, 176 Vt. 639 (mem.). Rather, "even if a parent participates in every program set forth in [DCF's] plan, the main concern must always be whether the individual parent has demonstrated the improvement contemplated at the time the children were removed from the parent's care." Id. ¶ 7. Here, the court recognized that father had, at times, made remarkable progress in addressing the concerns that led to O.S. being placed in DCF custody, and that he had the skills to parent O.S. when he was fully engaged in these efforts. Its finding of stagnation, however, appropriately focused on father's failure to maintain this engagement over time as anticipated in the plan of services. See id. ¶ 7 (affirming finding of stagnation where parent followed case plan and cooperated with providers but "despite those efforts . . . did not demonstrate the improvement expected of her").

This finding, moreover, was amply supported by the evidence. At the termination hearing, the DCF worker testified to the following. Though father completed the parenting classes called for in the case plan, he subsequently absented himself from O.S.'s life, and did not attend any visits between August and October 2023. When the extended reunification goal date approached in November of that year, father had essentially returned to where he was at the beginning of this case with respect to substance use and visit attendance. At that time, father increased his engagement with DCF and signed some releases allowing the agency to receive information from his service providers. In March 2024, DCF requested to continue the termination hearing because father was attending visits, and the agency wanted to give him another opportunity to demonstrate that he could maintain this progress over time. However, father later revoked the releases he had signed. For a period in May 2024, father refused to provide DCF with urinalysis results, which prevented the agency from assessing whether he was maintaining his sobriety. Father was then incarcerated briefly in June 2024. He did not communicate with the DCF worker when he went to residential treatment later that summer. He provided DCF with paperwork demonstrating that he completed the inpatient program, but did not give the caseworker information about any recommendations for further treatment or any ongoing engagement with services. At the time of the final hearing, he faced seven charges of violating conditions of probation, each of which had been accumulated over the course of three months.

This evidentiary record contravenes father's argument that this case is similar to In re T.M., 2016 VT 23, 201 Vt. 358. There, the family court found that the father had stagnated because he continued to use illicit drugs and failed to take responsibility for his actions, reflecting a failure to progress in his substance-use treatment as contemplated by the case plan. We reversed, concluding that the State failed to establish the meaning or reliability of the drug-

4

testing results relied on by the court, and "more significantly, there was no evidence connecting the test findings to [the] father's progress in substance abuse treatment, or to his parenting." Id. ¶¶ 18-19. Though father seems to suggest that the court's finding of stagnation was predicated on "bare evidence of non-compliance with drug conditions," this argument is not supported by the record. As set forth above, the State's evidence demonstrated the impact of father's intermittent engagement with multiple aspects of DCF's case plan on his ability to parent O.S. The family division did not err in finding stagnation.

Father next argues that the family division erred in concluding that the first best-interest factor did not weigh against the termination of his parental rights. Section 5114(a)(1) calls for the court to consider "the interaction and interrelationship of the child with his or her parents, siblings, foster parents, if any, and any other person who may significantly affect the child's best interests." In addressing this factor, the court noted that O.S. had positive interactions and a positive interrelationship with father, and he also had positive relationships with his maternal grandmother and extended family. It concluded that this factor weighed neither for nor against the termination of father's parental rights. Father argues that this analysis was erroneous because it failed to place primary weight on the relationship between parent and child, instead "comparing the relationships between O.S. and his grandmother and father as if the two were on equal footing."

As father recognizes, parents have a fundamental liberty interest in the care, custody, and control of their children. See Troxel v. Granville, 530 U.S. 57, 65 (2000); In re K.M.M., 2011 VT 30, ¶ 24, 189 Vt. 372. However, father has identified no support for his assertion that as a result of this interest, whenever a child has a positive relationship with a parent, § 5114(a)(1) should weigh against termination. As we have recognized, a parent's fundamental liberty interest in caring for his children "is not absolute and may be overcome[,]" and "in termination cases our polestar has been the best interests of the child." In re R.W., 2011 VT 124, ¶ 43, 191 Vt. 108 (quotation and alteration omitted). Termination cases are not akin to "a custody case in which the family court is weighing which parent or guardian will be best able to serve the needs of the child," but instead are "a legislatively created . . . proceeding in which the court is required to weigh specified statutory [best-interest] factors when determining whether to grant a petition for termination of residual parental rights." In re S.B., 174 Vt. 427, 428 (2002) (mem.).

The first of these factors calls for the court to consider the child's interaction and relationship with any person who may significantly affect the child's best interests. 33 V.S.A. § 5114(a)(1). That is precisely what the court did here. See In re N.L., 2019 VT 10, ¶ 9, 209 Vt. 450 ("As long as the court applied the proper standard . . . we will affirm its conclusions if they are supported by the findings." (quotation omitted)). The court applied the correct standard, and father's mere disagreement with the weight the family division assigned to the first factor does not make out a case for abuse of discretion. See In re A.F., 160 Vt. 175, 178 (1993) ("We leave it to the sound discretion of the family court . . . to weigh the evidence."). To the extent father otherwise intended raise a constitutional challenge, this contention is inadequately briefed, and we decline to address it. See State v. Bergquist, 2019 VT 17, ¶ 64 n.13, 210 Vt. 102 ("We will not consider issues, even those of a constitutional nature, that are insufficiently raised and inadequately briefed.").

Finally, father argues that the court erred in assessing the most important of the statutory best-interest factors—the likelihood that he would be able to resume parenting O.S. within a reasonable period of time. In re J.B., 167 Vt. 637, 639 (mem.); 33 V.S.A. § 5114(a)(3). "The reasonableness of the time period is measured from the perspective of the child's needs, and may

take account of the child's young age or special needs." In re C.P., 2012 VT 100, ¶ 30, 193 Vt. 29 (citations omitted).

Here, the court explained that O.S. was a young child who needed permanency. It lacked confidence that father could resume parenting him within a reasonable time as measured from O.S.'s perspective, noting that father's ability to meet O.S.'s needs during limited visits did not establish his ability to parent a child with special needs full-time. Father argues that the court's conclusion was speculative, and that its analysis impermissibly shifted the burden to father to prove that he could resume parenting within a reasonable time.

The court's conclusion was not unduly speculative. As we have long recognized, "[j]uvenile proceedings often involve difficult predictions about the future," and "[b]est judgment, rather than perfection, is our standard." In re J.D., 165 Vt. 440, 444-45 (1996). The third best-interest factor calls for a "forward-looking" analysis, but "[t]his does not mean . . . that past events are not relevant to whether the parent can resume parental duties." In re B.M., 165 Vt. 331, 337 (1996). The court did not err in considering father's long history of periods of progress followed by regression, in connection with the recent ebb of his engagement in the case plan, in assessing this factor. As discussed above, its finding was supported by the evidence. Nor did the court shift the burden of proof to father in observing that it lacked confidence in father's ability to resume parenting within a reasonable period—it merely commented on the state of the evidence before it. See In re B.C., 169 Vt. 1, 14 (1999) ("In noting the absence of any credible evidence that grandmother could assume the role of parent, the court was merely commenting on the state of the evidence, not signaling that it was grandmother's burden to prove her fitness."), clarified on other grounds in In re C.P., 2012 VT 100, 193 Vt. 29.

Father has identified no basis to disturb the judgment below.

Affirmed.

BY THE COURT:

Harold E. Eaton, Jr., Associate Justice

William D. Cohen, Associate Justice

Nancy J. Waples, Associate Justice

6