VERMONT SUPREME COURT
109 State Street
Montpelier VT 05609-0801
802-828-4774
www.vermontjudiciary.org



Case No.      22-AP-184

*Note: In the case title, an asterisk (\*) indicates an appellant and a double asterisk (\*\*) indicates a cross-appellant. Decisions of a three-justice panel are not to be considered as precedent before any tribunal.*

## ENTRY ORDER

NOVEMBER TERM,   2022

In re N.R., Juvenile
(B.R., Mother*)

}
}
}
}
}
}

APPEALED FROM:

Superior Court, Bennington Unit,
Family Division
CASE NO. 202-10-19 Bnjv
Trial Judge: Kerry Ann McDonald-Cady

In the above-entitled cause, the Clerk will enter:

Mother appeals from the trial court's order terminating her parental rights as to her daughter, N.R.  We affirm.

N.R. was born in August 2019.  Shortly before N.R.'s birth, the Department for Children and Families (DCF) received a report of concerns regarding mother's mental-health instability and her prior history with DCF.  Both of mother's other children are in DCF custody.  During one of those cases, mother made a violent threat against a DCF employee, which resulted in criminal charges.  DCF sought and received emergency custody of N.R. in October 2019 after mother reported to DCF that she was overwhelmed with caring for N.R. and shook her.  At an emergency care hearing in November 2019, mother stipulated to temporary DCF custody of the child.

In December 2019, DCF filed an initial case plan.  The plan goals focused on mother's mental health and learning to understand and recognize N.R.'s needs and how to meet them.  In August 2020, following a contested merits hearing, the court adjudicated N.R. a child in need of care or supervision (CHINS) and continued temporary DCF custody pending a disposition hearing.  After a hearing, the court approved a disposition case plan in December 2020.  This plan essentially mirrored DCF's initial case plan, focusing heavily on goals related to addressing mother's post-traumatic stress disorder and anxiety, as well as acquiring skills to safely parent during heightened emotional periods.  It also had recommendations for substance-abuse treatment based on mother's history of drug abuse.  The plan included a goal of reunification with mother by March 2021.*

---

*  At this point, the identity of N.R.'s father had not yet been determined.  The father was later confirmed through genetic testing and his rights were terminated without appeal.  Because

Throughout the case, mother struggled with emotional dysregulation. During a supervised visit in January 2021, mother became highly agitated when N.R. would not cooperate as mother tried to take a video of her. Mother used profanity directed at the DCF visit supervisor and N.R., and DCF ended the visit early because it was not safe for N.R. Shortly thereafter, DCF filed an emergency motion for a protective order to suspend parent-child contact, which the court granted. DCF, with permission from the court, gradually allowed visits to resume if mother could agree to follow behavioral guidelines. DCF prepared written guidelines and reviewed them with mother. In spring of 2021, however, mother had two additional incidents of uncontrolled aggression and emotional dysregulation during visits. First at a remote visit, mother repeatedly yelled and used profanity when N.R. identified the foster mother as "mama." Then at an in-person visit, mother became enraged and used inappropriate and aggressive language when N.R. prepared a pretend meal using a toy kitchen set and presented the meal to the DCF visit supervisor. Despite attempts by the visit supervisor to de-escalate the situation, mother did not calm down and continued to yell and use profanities toward both N.R. and the visit supervisor. Mother ignored the supervisor's attempts to end the visit, and left the facility while holding N.R. DCF moved for another juvenile protective order against mother. The court granted the motion in June 2021, allowing only supervised remote visits between mother and N.R. contingent on mother agreeing to safety guidelines prepared by DCF. DCF prepared those guidelines and reviewed them with mother. In September 2021, the court issued written findings and conclusions and granted DCF's request for a final juvenile protective order against mother. The order, which continued until September 2022, limited contact to supervised remote visits and made those visits contingent on mother's compliance with DCF's safety guidelines.

In June 2021, DCF changed its case-plan goal to adoption and moved to terminate mother's parental rights. The court held hearings in February and May 2022. In a June 2022 order, the court issued written findings and conclusions and terminated mother's parental rights to N.R. The court first concluded that there was a change in circumstances because mother had stagnated in her ability to parent. Despite mother's efforts toward meeting many of her case-plan goals, including attending mental-health counseling, the court found that mother was not able to benefit from therapy and continued to struggle with emotional dysregulation and managing her anger. It concluded that she had stagnated in her progress toward ameliorating the risks posed by her emotional dysregulation, which was the initial cause of DCF's involvement.

The court next analyzed the statutory best-interests factors. It found that N.R. had adjusted and bonded well to her foster family, who had cared for her since she was two months old. N.R. formed strong, loving relationships with the foster parents, their children, and their extended family. The foster family was consistently able to meet all of N.R.'s needs and indicated their desire to adopt N.R. if given the opportunity.

By contrast, the court found that mother's relationship with N.R. had been strained by numerous incidents of mother's uncontrolled anger, including repeatedly using inappropriate, profane, and aggressive language toward N.R., and attempting to physically remove N.R. from the supervised visit facility. The court found that mother declined to pursue a recommended mental-health treatment. Although she maintained stable housing and sobriety among other case-plan goals, she was unable to achieve the most important goal of parenting N.R. safely by

father is not directly relevant to this appeal, we do not address portions of the court's decisions or the record pertaining to him.

recognizing her needs and placing them before her own. The court noted that mother's visits with N.R. had been limited to remote, supervised visits for nearly a year at the time of the final termination hearing due to mother's behavior. N.R. had formed no connection to mother's community. It found that mother lacked capacity to safely parent N.R. due to her own mental-health instability and that she would not be able to resume parenting within a reasonable time. Given these facts as well as N.R.'s young age and need for stability, the court concluded that it was in N.R.'s best interests to terminate mother's parental rights.

On appeal, mother argues that the evidence and findings are insufficient to support the court's conclusions regarding stagnation and termination of parental rights. She contends that these conclusions cannot stand because the evidence supported only a few isolated incidents of her expressing anger toward DCF, rather than toward N.R., and because the trial court should have placed more weight on positive aspects of her relationship with N.R. Mother also argues that the trial court's protective orders were too restrictive and prejudiced her ability to develop a bond with N.R.

To terminate parental rights after an initial disposition order is in place, the family division must first conclude by clear and convincing evidence that there was a "change in circumstances." 33 V.S.A. § 5113(b). A change in circumstances is "most often found when the parent's ability to care properly for the child has either stagnated or deteriorated." In re M.M., 159 Vt. 517, 521 (1993) (quotation omitted). If it determines that there has been a change in circumstances, then it must determine whether termination is in the child's best interests. In re B.M., 165 Vt. 331, 335-36 (1996). The most important factor is whether the parent can resume parenting duties within a reasonable time. In re J.B., 167 Vt. 637, 639 (1998) (mem.). On appeal, we will uphold the family division's conclusions if supported by the findings and affirm the findings unless clearly erroneous. In re A.F., 160 Vt. 175, 178 (1993).

Here, the trial court's determination regarding stagnation was amply supported by its findings and record evidence. Mother points out that she was making progress toward many of her case-plan goals, but this fact does not preclude stagnation. See id. at 181 ("[T]he mere fact that a parent has shown some progress in some aspects of his or her life does not preclude a finding of changed circumstances warranting modification of a previous disposition order."). Although the court noted that mother had remained sober, secured stable housing, and engaged with mental-health counseling, it found that mother's mental-health instability continued to significantly impede her ability to safely parent N.R. It found that after two years with N.R. in DCF's care, mother still had not demonstrated the ability to recognize N.R.'s needs and place them before her own. Mother downplays the extent of her struggles with anger and claims that she is not a risk to N.R., but the evidence supports the court's findings to the contrary. Mother does not contest the court's descriptions of numerous incidents, based on admitted exhibits and witness testimony, where mother blamed and berated her infant child or screamed, cursed, and acted aggressively in N.R.'s presence, when the child ignored her or expressed preference for someone else. Mother also does not challenge the finding that when a visit supervisor told mother that a visit was over because mother had been yelling profanities while holding N.R. and could not calm down, mother ignored the visit supervisor and walked out of the facility while holding N.R. During the same visit, mother also made a threat of self-harm directly to N.R. As the court reasonably found based on the evidence, "[t]his was a toxic, aggressive incident [where] [N.R.]'s welfare was threatened by Mother's conduct. Mother's mental-health instability is so significant that supervised visits by trained professionals are not safe for [N.R.]."

3

Like the incident that initially led to DCF intervention, these events reflect how mother's mental-health struggles continued to pose serious physical and emotional risks to N.R. See In re D.M., 2004 VT 41, ¶ 5, 176 Vt. 639 (mem.) ("The key question for the court when considering whether stagnation has occurred is whether the parent has made progress in ameliorating the conditions that led to state intervention."). We see no error in the court's stagnation conclusion.

For similar reasons, we reject mother's challenges to the termination of her parental rights. Mother claims that the court relied on just a few isolated angry encounters with DCF staff which occurred too far in the past to be relevant. We disagree with mother's interpretation of the record. As noted above, the court relied on numerous examples of mother's aggressive and inappropriate behavior during periods of emotional volatility, which created dangerous situations not only for DCF staff, but also for N.R. The court's most recent example of concerning behavior involving N.R. occurred in June 2021, approximately eight months before the termination hearings began. That there were not more recent troubling incidents was due in major part to the court's protective order, issued shortly after this event, which prohibited in-person contact between mother and N.R. and limited remote visitation to once per week. As addressed in more detail below, the protective order was an appropriate measure to protect N.R. given mother's persistent volatile and dangerous behavior. Thus, the lack of dangerous interactions between mother and N.R. in the months leading up to the termination hearing was not a reflection of mother's improvement but rather because mother's prior behavior was so dangerous that the court needed to prohibit in-person visits altogether.

Contrary to mother's assertions, the court did not ignore good aspects of mother's visits with N.R. It acknowledged, for example, that remote visits during COVID-19 protocols were positive, with mother singing and reading stories to N.R. However, the weight to be assigned to this evidence was a matter for the trial court. See In re S.B., 174 Vt. 427, 429 (2002) (mem.) ("Our role is not to second-guess the family court or to reweigh the evidence, but rather to determine whether the court abused its discretion in terminating [an individual's] parental rights . . . ."). The court's decision to terminate mother's parental rights was supported not only by mother's inability to safely parent N.R. and their lack of a bond, but also by the stable and nourishing home provided by the foster parents. See In re R.W., 154 Vt. 649, 650 (1990) (mem.) (noting that child's right to stable home life is proper factor to consider in deciding whether to terminate parental rights). N.R. had adjusted well to and developed strong bonds with her foster family, with whom she had lived for nearly her entire life at the time of the termination hearings.

Mother additionally contends that the court erred by relying on evidence of new criminal charges against mother because these charges had not yet been fully adjudicated. We see no error, as the court did not presume mother's guilt. It merely recognized that felony charges of first degree aggravated domestic assault and aggravated stalking were serious, that her involvement in violent encounters reflected continuing struggles with mental-health instability, and that the potential for incarceration could negatively impact her ability to parent N.R. Cf. In re N.L., 2019 VT 10, ¶ 14, 209 Vt. 250 ("Mother's due process claim is based on a faulty premise—that the court presumed she was guilty of the potential federal charges for which she was incarcerated. The court did not presume her guilt, but rather acknowledged the seriousness of the alleged crimes and the potential for lengthy incarceration, focusing mainly on the impact of her incarceration on her ability to parent N.L. within a reasonable period of time under all the circumstances.").

Finally, we turn to mother's argument that the court's protective orders were overly restrictive, and that the ban on in-person visitation unfairly impeded her progress toward case-plan goals. The family division has discretion to issue a protective order if it finds conduct that "may be detrimental or harmful to a child." 33 V.S.A. § 5115(a). The protective order "will stand on appellate review unless the record indicates that the court exercised its discretion for clearly untenable reasons or to an extent clearly unreasonable." In re J.S., 153 Vt. 365, 371 (1989). Though mother identifies alternative measures that she thinks would have been appropriate to protect N.R. while maintaining in-person visitation—such as requiring mother to talk in a soft voice or remain six feet away from the child—she does not persuade us that these measures would have been effective given mother's history, or that the trial court abused its discretion. The court initially suspended contact on an emergency basis in January 2021 after repeated incidents where mother screamed and cursed at N.R. or DCF staff and engaged in escalated, threatening behavior. In February 2021, the court provided mother with the opportunity to resume in-person visitation if she could follow behavioral guidelines established by the visitation facility, which included that mother refrain from hostile or aggressive conduct, not raise her voice in an aggressive manner, and not use vulgar language. Mother transgressed all of these conditions in a June 2021 visit, and when the visit supervisor sought to end the visit due to mother's behavior, she ignored the supervisor and left the facility while holding N.R. Given these circumstances, the trial court acted within its discretion to pause in-person visitation for a longer period to protect N.R. Any negative impact that the protective order had on mother's relationship with N.R. was mother's fault. We see no reason to disturb the family division's decision to terminate mother's parental rights.

Affirmed.

BY THE COURT:

Paul L. Reiber, Chief Justice

Harold E. Eaton, Jr., Associate Justice

Karen R. Carroll, Associate Justice