VERMONT SUPREME COURT
109 State Street
Montpelier VT 05609-0801
802-828-4774
www.vermontjudiciary.org

Case No.      25-AP-346



*Note: In the case title, an asterisk (\*) indicates an appellant and a double asterisk (\*\*) indicates a cross-appellant. Decisions of a three-justice panel are not to be considered as precedent before any tribunal.*

## ENTRY ORDER

FEBRUARY TERM,   2026

| | |
|---|---|
| In re N.M. and H.M., Juveniles (B.M., Mother\*) | APPEALED FROM:<br><br>Superior Court, Franklin Unit,<br>Family Division<br>CASE NO. 22-JV-01255; 22-JV-01256<br>Trial Judge: Elizabeth Novotny |

In the above-entitled cause, the Clerk will enter:

Mother appeals the termination of her parental rights to minor children H.M. and N.M.[\*] We affirm.

H.M. was born in February 2016 and N.M. was born in August 2019.  In August 2022, the State filed a petition alleging that H.M. and N.M. were children in need of care or supervision (CHINS).  The affidavit supporting the petition stated that mother, who was the children's sole custodial parent, lacked stable housing; the children were living in a filthy hotel room that was infested with fleas and lice; the children smelled of urine and feces; N.M.'s feces contained a balloon and Styrofoam pellets from a beanbag; and H.M. inconsistently attended the last six weeks of the 2021-2022 school year.  The court issued emergency and temporary care orders transferring custody of the children to the Department for Children and Families (DCF).

In January 2023, the parties stipulated to the merits of the CHINS petition.  At disposition, the court established a permanency goal of reunification with either parent by July 2023.  The case plan adopted by the court called for mother to: obtain safe and stable housing and income; attend all school meetings for the children; complete a parenting education class; follow recommendations from a court-ordered mental health evaluation; engage in mental-health counseling; sign releases for DCF to communicate with providers; participate in Family Time Coordination; and participate calmly and productively in meetings with DCF and other service providers.

---

[\*] The court also terminated father's parental rights, and father did not appeal.

In February 2024, DCF filed petitions to terminate the parental rights of mother and father. It later withdrew the petitions due to issues with the children's pre-adoptive placement. In November 2024, the children's attorney moved to terminate parental rights.

The court held a termination hearing in June 2025 and issued a written decision containing the following findings. As a child, mother was physically abused by her foster parents and ran away often. When she was eighteen, she left her adoptive family and began living independently. She had no family to support her. She had a lengthy history of drug use, homelessness, and criminal activity. Her longest period of employment was with McDonalds from 2015 to 2018; after that, she was unemployed. Prior to the filing of the CHINS petition in 2022, mother struggled to work with providers, engaged in substance use, exposed her children to drugs and drug paraphernalia, and had difficulty meeting the children's needs including safe and stable housing.

Mother attempted suicide in November 2022. During an interview with a qualified mental-health provider in December 2022, mother reported sobriety from alcohol and other substances except for marijuana. The provider diagnosed mother with posttraumatic stress disorder and unspecified psychotic disorder. Mother exhibited paranoia and believed that people were crawling above her ceiling at night and engaging in conspiracies against her. Around this time, mother was charged with simple assault, aggravated assault, and unlawful trespass. In January 2023, mother was hospitalized at the Vermont Psychiatric Hospital.

By February 2023, both children were in the care of their paternal grandmother. Mother was granted a one-hour supervised visit and a one-hour virtual visit with the children each week. In August 2023, mother's weekly supervised visits were extended to ninety minutes.

In October 2023, mother was living with her boyfriend in an RV. One day, she became enraged and broke a window to get into the RV while threatening her boyfriend. Her boyfriend's fourteen-year-old son was present during this incident. Mother's boyfriend filed for a relief-from-abuse order but missed the final hearing on his petition because mother removed the notice of hearing from his mailbox. Mother moved out of the RV after this incident.

Mother began Family Time Coaching in July 2023. In October 2023, she was discharged from the program due to inconsistent communication with staff, dysregulation, and resistance to coaching. Mother continued to have supervised visits through All About Kids (AAK). Mother frequently brought up adult topics with the children during supervised visits and staff often had to redirect her. In December 2023, AAK staff contacted DCF for assistance after mother became escalated during a visit. One of the children made a comment about their foster mother and mother said she would not let the girls leave when the foster mother came to pick them up. Police and a crisis worker were called to respond. DCF subsequently created a safety plan with mother which directed mother's therapist and attorney to address mother's escalating and volatile communications with DCF. In early 2024, AAK discharged mother due to mother's inability to focus on her children and her dysregulation. Mother's supervised visits subsequently took place at the DCF office. Due to mother's volatile behavior, DCF held the visits in a secure room with two staff members present. These limitations continued to be in place at the time of the termination hearing.

The court found that mother's mental-health issues were a barrier to reunification. Although mother attended team meetings and other important meetings, she was unable to listen and was angry and highly reactive. Meetings frequently ended early due to mother's behavior. During the first half of 2023, mother went to therapy twice a month and was working on her trauma, depression and anxiety. Mother also completed the Nurturing Parents class. However, when DCF staff asked mother what she had learned during the class, she became so dysregulated that they could not complete the conversation. In July 2024, DCF learned that mother had been discharged by her counselor. Mother claimed to be seeing a different counselor but refused to provide their last name or address, making it impossible for DCF to confirm whether she was in counseling after July 2024.

Mother did not obtain safe and stable housing during the pendency of the proceeding. At times, DCF did not know where she was living. By January 2024, she had returned to live with her boyfriend. In 2025, she reported to DCF that she was living in an RV with an "elderly gentleman," but did not provide an address. DCF learned mother's address, which was for her boyfriend's property, from her probation officer. DCF did not consider mother's boyfriend to be a safe person for the children to be around due to mother's volatility and the boyfriend's mental health issues.

Mother was incarcerated for a period during March and April 2024. Around this time, she tested positive for cocaine. Mother claimed that her boyfriend put the cocaine in her food, which the court did not find to be credible.

The criminal court ordered mother to undergo a competency evaluation, which occurred in August 2024. During her evaluation, mother admitted to recently using alcohol, cocaine, and cannabis. Mother stated that about three months earlier, someone had injected her with heroin against her will. The court did not find this to be credible and found that mother had relapsed. Mother had a prescription for Suboxone but it was unclear whether she was taking it as prescribed. Mother reported that she had been psychiatrically hospitalized multiple times and had a long history of suicide attempts. At the time of her evaluation, she was not taking her psychiatric medications. The psychiatrist conducting the evaluation diagnosed mother with "unspecified schizophrenia spectrum and other psychotic disorder, unspecified trauma and stressor-related disorder, severe stimulant use disorder, severe alcohol use disorder (early remission), [and] severe opioid use disorder with sustained remission." The court found this diagnosis to be credible and reliable, except that it did not adopt the conclusion that mother was in sustained remission from opioid use given her relapse with heroin.

In March 2025, mother resolved her pending criminal cases by pleading guilty to a charge of violating an abuse prevention order. She received a suspended sentence of zero to six months with minimal probation.

Mother continued to be unable to communicate effectively with DCF. During a visit to the DCF office in March 2025, mother followed a DCF worker into a locked private area despite being told not to. During a shared parenting meeting in May 2025, mother was yelling and upset with DCF. She threatened to sue her children's attorney and accused the attorney and DCF of having conflicts of interest. Her conduct was so chaotic that the foster mother, who was in attendance, considered leaving the meeting. During supervised visits, mother refused to clean up

after herself, which the court found demonstrated a lack of insight into the importance of maintaining a safe and clean environment for the children. Mother's failure to follow reasonable instructions impeded her progress toward unsupervised visits.

At the time of the termination hearing, the children were still in the care of their paternal grandmother but had begun to transition to a pre-adoptive foster family. They appeared to be adapting well to the new placement. Their foster parents were able and willing to meet the children's developmental needs and wanted to adopt them.

The court found that mother had stagnated in her progress toward reunification because she had not obtained safe or stable housing for the children, her weekly visits continued to be supervised for safety reasons, she had not consistently engaged in mental-health treatment, and she was unable to work cooperatively with DCF or other providers. The court then assessed the statutory best-interests factors. It found that mother had a strong bond with the children as their former primary caregiver. However, her time with them over the past three years was limited and the children did not talk about mother when they were with their foster family. The children had formed a bond with their new foster family and fit in well to their household. The court found that mother would not be able to resume parental duties within a reasonable time, due to her lack of steady income or stable housing that could safely accommodate the children, her ongoing relationship with her boyfriend, her mental-health issues, and her continued inability to communicate effectively with or accept reasonable feedback from DCF and other providers. Finally, it found that mother did not play a constructive role in the children's lives. The court therefore concluded that termination of mother's parental rights was in the children's best interests. Mother appealed.

When considering a petition to terminate parental rights after initial disposition, the family court must first determine whether there has been a change in circumstances sufficient to justify modification of the original disposition order. In re B.W., 162 Vt. 287, 291 (1994). "A change in circumstances is most often found when the parent's ability to care properly for the child has either stagnated or deteriorated over the passage of time." In re H.A., 153 Vt. 504, 515 (1990). If the court finds a change in circumstances, it must then consider whether termination is in the child's best interests in accordance with the factors set forth in 33 V.S.A. § 5114(a). "As long as the court applied the proper standard, we will not disturb its findings unless they are clearly erroneous, and we will affirm its conclusions if they are supported by the findings." In re N.L., 2019 VT 10, ¶ 9, 209 Vt. 450.

On appeal, mother argues that the stagnation finding was erroneous because the record demonstrates that she made progress in all areas of the case plan. "The key question for the court when considering whether stagnation has occurred is whether the parent has made progress in ameliorating the conditions that led to state intervention." In re D.M., 2004 VT 41, ¶ 7, 176 Vt. 639 (mem.). Stagnation may be "found in cases in which parenting skills improve, yet the improvement is so insignificant that it is unlikely the parent will be able to resume parental duties in a reasonable time." In re D.M., 162 Vt. 33, 38 (1994).

Mother asserts that a DCF caseworker testified that mother made "significant progress" toward reunification. This is inaccurate. The caseworker did agree with mother's counsel that, if mother had obtained suitable housing and employment, was engaged in counseling and

medication-assisted treatment, and police had not been called on any recent visits, this would represent significant progress. But the caseworker went on to say that she did not know if mother had in fact achieved those milestones: "I don't know anything about her employment. I don't know anything about her consistency and her attendance. I don't know anything about [medication-assisted treatment] right now, so I couldn't answer that." This testimony therefore does not support mother's claim of significant progress. Similarly, the record does not support mother's assertion that she attended counseling for twelve months prior to the termination hearing. The caseworker testified that mother had been attending counseling since December of 2024, or approximately six months, after a gap of about six months.

Mother claims the record showed that at the time of the hearing, she had obtained a stable living situation where she had resided for three months and was employed as a home health aide. However, the court found that mother's residence was not safe or stable for the children, both because of the inaccessibility of the bathroom and because it appeared to be on the property of her boyfriend, who was not a safe individual for the children. Mother does not challenge these predicate findings, which support the court's reasoning. As for mother's employment, the caseworker testified that the probation officer reported mother had a job, but there was no other evidence offered about how long mother had been employed, how much she earned, or whether she had any other sources of income. Under these circumstances, the court was free to give this evidence little weight. See In re A.F., 160 Vt. 175, 178 (1993) ("We leave it to the sound discretion of the family court to determine the credibility of the witnesses and to weigh the evidence.").

Next, mother argues the two DCF case workers who testified on behalf of the State lacked knowledge of mother's current progress toward the case plan goals because the first worker was on the case from 2022 to February 2024, and the second worker had only been working with mother for a few weeks because her assigned caseworker was on leave. We have reviewed the record and conclude that the caseworkers' testimony supports the court's findings regarding mother's current situation. The first caseworker testified that although she was no longer the primary person assigned to the case, she continued to periodically supervise visits and be consulted by mother's caseworker, demonstrating that she had personal knowledge of mother's current situation. She testified that mother consistently attended visits but frequently became dysregulated if the children made a comment she didn't like or the visit supervisor offered direction. She explained that mother's volatile behavior toward DCF staff had made it necessary to implement a conduct plan. Mother was unable to consistently follow the conduct plan, which was still in effect. The first caseworker testified that based on her personal observations during supervised visits and her knowledge of the case plan, very little had changed since she was assigned to the case. The second caseworker recounted mother's description of her current living situation during a recent meeting. She also testified to mother's dysregulation during a May 2025 shared parenting meeting. Both caseworkers agreed that mother appeared to have reenrolled in counseling in December 2024 or January 2025, but they had no information about the nature or frequency of the counseling.

This record, as well as the other testimony presented by the State, supports the court's finding that mother stagnated in her progress toward addressing the issues that led the children to enter state custody. While mother accomplished some of the case plan goals such as completing a parenting class, the court found, and the record shows, that she was inconsistent or made no

5

progress on others. Mother never progressed beyond supervised visitation or obtained stable housing, her attendance at counseling was inconsistent, she did not participate productively in Family Time Coaching, and she refused to cooperate with DCF. "[T]he mere fact that a parent has shown some progress in some aspects of his or her life does not preclude a finding of changed circumstances warranting modification of a previous disposition order." In re A.F., 160 Vt. at 181. Because the finding of stagnation is supported by the record, and mother does not challenge the court's assessment of the children's best interests, we see no reason to disturb the decision below.

Affirmed.

BY THE COURT:

_____
Paul L. Reiber, Chief Justice

_____
Harold E. Eaton, Jr., Associate Justice

_____
Nancy J. Waples, Associate Justice